JOHNSON *v.* JOHNSON.

1. APPEAL AND ERROR—CHANCERY CASE—SEPARATE MAINTENANCE—DIVORCE—DE NOVO REVIEW.

Suit by wife for separate maintenance wherein husband sought divorce is reviewed *de novo* by Supreme Court since it is a chancery case.

2. HUSBAND AND WIFE—SEPARATE MAINTENANCE—REVIEW BY SUPREME COURT—FINDINGS OF TRIAL JUDGE.

On review of record in suit for separate maintenance, the Supreme Court is not disposed to disagree with the conclusions of the trial judge who saw and heard the witnesses and was able to measure their credibility and will not reverse the trial court's decision unless convinced it must have reached a different conclusion had it occupied the position of the lower court.

3. SAME—SEPARATE MAINTENANCE—DIVORCE—STATUTES.

In wife's suit seeking only separate maintenance under statute husband will not be granted divorce on his cross bill where he failed to establish his right thereto and a decree of absolute divorce cannot be forced upon her (3 Comp. Laws 1929, § 12794).

4. SAME—SEPARATE MAINTENANCE—CUSTODY OF CHILDREN—EVIDENCE.

In wife's suit for separate maintenance, facts and circumstances shown by record justified granting her separate maintenance and custody of minor child.

Appeal from Kent; Verdier (Leonard D.), J. Submitted April 10, 1946. (Docket No. 76, Calendar No. 43,205.) Decided May 13, 1946.

Bill by Doris L. Johnson against Homer Johnson for separate maintenance on grounds of cruelty.

Cross bill by defendant against plaintiff for divorce on grounds of cruelty. Decree for plaintiff. Defendant appeals. Affirmed.

*Linsey, Shivel, Phelps & Vander Wal,* for plaintiff.

*John J. Smolenski (Bidwell & Schmidt,* of counsel), for defendant.

STARR, J. These parties were married in July, 1932, and one child, a son now about 11 years old, was born of the marriage. In October, 1943, plaintiff, then a resident of Grand Rapids, filed petition for separate maintenance under 3 Comp. Laws 1929, § 12794 (Stat. Ann. § 25.211). She alleged that defendant was guilty of extreme and repeated cruelty; that he had failed and refused to provide her and the child with a home and sufficient support; that he had sought the company of another woman; and that he and this woman were living in the same house in Detroit. She alleged that defendant's misconduct had so impaired her health and nervous system that she had been committed to the Kalamazoo State hospital for several months; and that while there, defendant, as her guardian, obtained $3,000 from their joint bank account and invested it in the Detroit home in which he and the other woman were living. She further alleged that she had later been adjudged sane and released from the hospital, but that she was without funds and unable to engage in steady employment and was in dire need of financial assistance.

Defendant answered, denying plaintiff's charges and her right to separate maintenance. He later filed a cross bill in which he asked for an absolute divorce on the ground of extreme and repeated

cruelty. He alleged that for many years plaintiff had failed and refused to fulfill her marital obligations; that she had become so obsessed with certain religious beliefs that she refused to attend social gatherings and to have sexual intercourse with him. He alleged that she was not completely sane at the time of their marriage; and that her religious obsession had so unbalanced her mind that she was committed to the Kalamazoo State hospital. He further alleged that, although her sanity had been legally restored, she continued to be obsessed with insane ideas; and that she had failed to care properly for their home and their child.

The case was tried and a decree entered granting plaintiff separate maintenance, the custody of the minor child, alimony of $20 a week, and dismissing defendant's cross bill. On his petition the alimony was later reduced to $18 a week. He also filed petition to amend the decree so as to grant him an absolute divorce and custody of the child. Further testimony was taken and an order entered denying this petition. Defendant appeals, and, this being a chancery case, we review *de novo*.

These parties apparently lived rather happily together for several years after their marriage. They bought and paid for a home in Grand Rapids and paid for a farm which they had purchased in Gratiot county. Their marital discord appears to have started following plaintiff's conversion to certain religious beliefs at an evangelistic meeting in 1935. In January, 1943, plaintiff suffered a mental breakdown and was committed by court order to the Kalamazoo State hospital, where she remained for several months. During her confinement in the hospital defendant was appointed as her guardian. He immediately withdrew about $2,900 from their joint bank account and invested it in the purchase of

a home in Detroit. Plaintiff charged him with improper association with a certain woman, and he admits that after acquiring the home in Detroit, he rented it to this woman, that she and her family occupied it, and that he lived there, ostensibly as a roomer and boarder.

In the summer of 1943 plaintiff had sufficiently recovered her health to leave the State hospital, and later a court order was entered restoring her sanity. Upon her discharge from the hospital the parties apparently made some effort to effect a reconciliation. They went on a vacation trip together, but after a few days they separated, and defendant left plaintiff with relatives in Lansing and returned to Detroit. He thereafter sent her small sums of money but not sufficient for the support of herself and the child. Other attempts to effect a reconciliation were futile, and in October, 1943, plaintiff began the present suit for separate maintenance.

The record is quite convincing that the marital difficulties between these parties are irreconcilable and that it will be impossible for them to live in peace and harmony. Defendant blames their domestic troubles on plaintiff's alleged religious fanaticism. It appears that she devoted considerable time to religious reading and activities, and she admitted that she refused to attend dances and moving-picture theaters and that she objected to card playing. However, she denied that she refused him sexual intercourse.

Plaintiff blames their troubles on defendant's interest in and improper conduct with the other woman in the case and on his failure to provide her and their minor son with a home and proper support. The testimony is conflicting, but it appears that defendant had lost all interest in his wife. He said, "I would not live with her if she was the only

one in the world." The record establishes that during plaintiff's confinement in the State hospital he openly consorted with and went on trips with the other woman. After plaintiff's discharge from the hospital he continued to live in the same house with this woman in Detroit, and during this time he failed to provide plaintiff and their child, who were living in Grand Rapids, with a home and with proper support. One of defendant's sisters, who testified in behalf of plaintiff, said:

"I have known Mrs. Doris Johnson (plaintiff) since she was 10 or 12 years old. We were raised in the same neighborhood. * * * I saw him (defendant) while he was in Detroit. I remember when all of us were invited to dinner over at another sister's home. That was in March, 1943. * * * When he came Mrs. Hayward (the other woman) was with him. * * * My observation about the action of Mrs. Hayward towards Homer and of Homer toward her while there was that it was too friendly for just a housekeeper. * * * I saw Homer and this woman together at our bee farm seven miles north of St. Johns. * * * I saw them together after that at my parents' home. * * * Doris Johnson is a woman of good character. She has been a good mother to this child. I don't know anything about her character that is not good. I have been in their home when they were living together and she is a good housekeeper and a good cook. On the occasions I have seen their son he has been well cared for."

Another of defendant's sisters, who testified in behalf of plaintiff, said in part:

"I have known Doris since childhood. I saw my brother Homer in company with another woman when he came to my house in May, 1943. * * * Doris Johnson is a woman of good character and to my knowledge has been a good mother to this child.

I don't know of anything unfavorable about her character. * * * I talked with him and he tried to tell me that religion was destroying his home and I tried to show him that there were many things much worse than religion in a home.''

Defendant's cousin, who was called as a witness by plaintiff, testified: ''I have known his wife, Doris Johnson, ever since they were married. * * * I have had an opportunity to observe her character and conduct and believe she is as good as gold. She was an average housekeeper and the boy is an average boy.'' Some of the friends and former neighbors of the parties testified that plaintiff's conduct and her care of the child were entirely proper, while others testified in substance that she was overzealous in her religious activities and that she failed to care for the child.

It would serve no useful purpose to quote or discuss further the conflicting testimony regarding the personal conduct of the parties. The trial court saw and heard them and their witnesses and was best able to measure their credibility. In his opinion the court said in part:

''In the latter part of 1935 plaintiff joined the church, since which time the parties have been drifting farther and farther apart. While defendant did not oppose her religious views, he objected to her forcing them upon him and finally left home, returning only for visits which became more and more seldom. * * *

''The real reason why the attempt to resume marital relations was unsuccessful is defendant's friendship with another woman. This friendship commenced long before plaintiff's release from the State hospital. Defendant lives in the same home with this other woman, takes her on automobile, hunting and fishing trips, and is altogether too

familiar with her to characterize his conduct as merely a casual, innocent friendship. His relations with this woman are the main cause of the trouble between these parties and operate as a complete bar to any hope of a reconciliation, even though it be said that plaintiff's extreme religious beliefs are a contributing factor.

"It is my opinion that these parties should be divorced; but defendant has failed to establish grounds for divorce and his cross bill must therefore be dismissed. Plaintiff evidently does not desire a divorce and  *  *  *  I cannot force upon her a decree of divorce when she specifically requests separate maintenance."

In the case of *Kolberg* v. *Kolberg,* 312 Mich. 42, 46, 47, we quoted with approval from *Chubb* v. *Chubb,* 297 Mich. 501, 506, as follows:

"While we are not restricted by the findings of the circuit court, a divorce case on appeal being heard *de novo,* especial consideration is given to such findings, so largely based upon the credibility of the witnesses, and the reviewing court ought not to reverse the determination of the trial court in such a case, unless convinced that it must have reached a different conclusion had it occupied the position of the lower court, under like circumstances. *Brookhouse* v. *Brookhouse,* 286 Mich. 151; *Stratmann* v. *Stratmann,* 287 Mich. 94; *Westgate* v. *Westgate,* 291 Mich. 18."

Defendant failed to establish his right to an absolute divorce, and, as plaintiff seeks only separate maintenance under the statute cited above, a decree of absolute divorce cannot be forced upon her. *Ratcliffe* v. *Ratcliffe,* 308 Mich. 488; *Stouten* v. *Stouten,* 235 Mich. 427; *Litynski* v. *Litynski,* 227 Mich. 502; *Lacey* v. *Lacey,* 189 Mich. 271.

The facts and circumstances shown by the record justified granting plaintiff separate maintenance

and the custody of the minor child. The decree of the trial court is affirmed. Plaintiff may recover costs of both courts.

BUTZEL, C. J., and CARR, BUSHNELL, SHARPE, BOYLES, REID, and NORTH, JJ., concurred.